UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                      :

UNITED STATES OF AMERICA,            :        00-CR-603 (ARR)
                                        :

    -against-                        :

                                        :

MANZOOR QADAR,                 :        **OPINION & ORDER**
                                        :

                   *Defendant.*          :

                                        :
------------------------------------------------------------------- X

ROSS, United States District Judge:

      Defendant, Manzoor Qadar, moves to reconsider my May 20, 2020 opinion and order denying his motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). Def.'s Mot. Recons., ECF No. 133-1. The government opposes. Recons. Opp'n, ECF No. 135. Based on an intervening change in controlling law and new evidence, I grant defendant's motion to reconsider and reduce his life sentence to time served.

## BACKGROUND

***Offense and Conviction***

      On April 17, 2002, a jury found defendant, Manzoor Qadar, guilty of murder-for-hire and conspiracy to commit murder-for-hire, in violation of 18 U.S.C. § 1958.[1] *Qadar v. United States*,

---

[1] Mr. Qadar also was convicted of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c), but I vacated this conviction on June 24, 2020, holding that under current Supreme Court precedent murder-for-hire and conspiracy to commit murder-for-hire are not predicate crimes of violence. *Qadar v. United States*, No. 00-CR-603 (ARR), 2020 WL 3451658, at *2 (E.D.N.Y. June 24, 2020); *see also Qadar v. United States*, No. 00-CR-603 (ARR), 2020 WL 5027143 (E.D.N.Y. Aug. 25, 2020) (denying request for resentencing because Mr. Qadar's other two convictions required mandatory life sentences).

No. 13-CV-2967 (ARR), 2014 WL 3921360, at *1–2 (E.D.N.Y. Aug. 11, 2014).[2] Mr. Qadar's convictions stem from the 1996 murder of Shaukat Parvez ("Shaukat"), a Pakistani immigrant who was shot near his home in Queens, New York.

Shaukat had secretly married Rubina Malik Parvez ("Rubina"), the daughter of an influential Pakistani businessman named Malik Rahmet Khan ("Rahmet"), against Rahmet's wishes. Rahmet had arranged for Rubina to marry another man, Khurram Khan. After learning of Rubina's marriage to Shaukat, Rahmet, who considered Rubina's actions dishonorable, became enraged. Fearing for their lives, Rubina and Khan fled to New York, where Rubina reunited with Shaukat.

Rahmet then began conspiring with his son (and Rubina's brother), Omar Malik ("Omar"), who was also living in New York, to kill Shaukat, Rubina, and Khan. At this point, Mr. Qadar, who was Shaukat's cousin, became involved in the father-son conspiracy. On November 15, 1996, Mr. Qadar flew from Manchester, England, to New York at Rahmet's request. At trial, the prosecution argued that Rahmet hired Mr. Qadar to assist in finding and killing Shaukat, while the defense argued that Mr. Qadar travelled to New York to mediate the conflict between Rubina and her family.

Shaukat was shot and killed on November 22, 1996 from a car in which Omar and Mr. Qadar were the sole occupants. It remains unknown which of the two men fired the shots. At trial, one witness testified that Omar claimed to have killed Shaukat, while another witness testified that Omar claimed Rahmet paid someone else to kill Shaukat. In his post-trial motions, Mr. Qadar submitted declarations of four individuals close to Rahmet, Omar, and Mr. Qadar, all of whom

---

[2] The following facts are taken from this opinion and from a letter I wrote to the Department of Justice in support of Mr. Qadar's prisoner transfer to the Untied Kingdom. *See* Def.'s Mot. Sentence Reduction ("Def.'s Mot."), Ex. H, ECF No. 119-2.

claimed to have direct knowledge that Omar was the one who shot Shaukat and that Mr. Qadar had no advance knowledge of the shooting. Nonetheless, I denied Mr. Qadar's post-trial motions because the declarations were composed entirely of inadmissible hearsay.

### Sentencing

According to the presentence report, Mr. Qadar was living a productive and law-abiding life as an English citizen before Shaukat's death. PSR ¶¶ 73–74, 76–81. He was married to his wife, Fehmeeda Begum, and they had six children who ranged in age from five to seventeen at the time. *Id.* ¶ 62. While Rahmet had a reputation for brutality, *id.* ¶ 65 ("[Rahmet] was known to have committed other murders in Pakistan."), Mr. Qadar was known as a peaceful and loving husband and father. Mr. Qadar's brother described him as "'peaceful, not violent' and a good citizen who has a 'very loving and very caring' relationship with his family." *Id.* ¶ 64. He "wanted his children to have the best education possible, and believed education was the path to a better life for his sons and daughters." *Id.* During the presentence interview, Mr. Qadar presented the probation officer with several certificates he earned while incarcerated in London awaiting extradition that attested to his "level-headed" and "impeccable" behavior. *Id.* ¶ 67.

In conclusion, the Probation Department noted that I may want to depart from the Guidelines sentence of life imprisonment because of "serious coercion, blackmail or duress," given that Mr. Qadar reportedly "became involved in the dispute between [Rahmet] and [Shaukat] because of threats made against [his] family by men who 'have a notorious record of killing people.'" *Id.* ¶ 97. Despite these mitigating factors, I could not depart downward because I was statutorily required to sentence Mr. Qadar to life in prison under 18 U.S.C. § 1958. Accordingly, I sentenced Mr. Qadar to mandatory life imprisonment on June 10, 2003. Sentencing Tr. 11:5–7, ECF No. 111.

*Treaty Transfer Requests and Visa Denials*

Before sentencing, Mr. Qadar requested that I recommend him for the International Prisoner Transfer Program. Def.'s Pre-Sentence Letter (Sept. 18, 2002). This program, administered by the Department of Justice ("DOJ"), allows certain foreign prisoners who have been convicted in the United States to serve their sentence in their home country. U.S. Dep't of Justice, International Prisoner Transfer Program, https://www.justice.gov/criminal-oia/iptu (last updated Nov. 24, 2020). "The transfer decision is a discretionary one based on the satisfaction of statutory and treaty requirements and is informed by internal guidelines that are applied to the unique facts of each case." *Id.*

At sentencing, I expressed support for Mr. Qadar's participation in the program, noting that "it would mean a lot to Mr. Qadar to be in his home country rather than in the United States" where "[h]e wouldn't be able to see his family." Sentencing Tr. 12:15–17, 13:3–6. However, I lacked the power to order DOJ to transfer Mr. Qadar to the United Kingdom. *See, e.g.*, Order (May 1, 2018), ECF No. 109 ("[A]t the time of your sentence, I recommended to the Department of Justice that you be permitted to participate in the international prisoner treaty program and my recommendation was made part of your judgment and commitment order. Regrettably, beyond that recommendation, I am not empowered to take any action on your request."); Order (Mar. 27, 2018), ECF No. 108 ("[T]he determination of whether to permit the requested transfer is within the sole jurisdiction of the Dept. of Justice and this Court is not empowered to take any action on this request.").

Subsequently, Mr. Qadar applied to the transfer program several times. Def.'s Mot. 23–24, ECF No. 119-1. Even though the UK appears to be willing to accept him, *see id.*, Ex. F,[3] DOJ

---

[3] All exhibits to defendant's motion can be found at ECF No. 119-2.

repeatedly rejected his requests, *id.* at 23–24. The most recent denials are dated October 13, 2009, May 15, 2012, July 24, 2015, and December 5, 2017.[4] *Id.*, Ex. G. In them, the agency states that it has denied Mr. Qadar's transfer request "because of the seriousness of the offense and because of serious law enforcement concerns." *Id.*

In March 2019, having received a poignant letter from Mr. Qadar's youngest daughter, Juwairiah, pleading for her father's transfer to the UK, I wrote to the International Prisoner Transfer Unit of DOJ in support of Mr. Qadar's transfer application. *Id.*, Ex. H. I stated that "Mr. Qadar was clearly the least culpable member of this horrific conspiracy." *Id.* "[B]ecause authorities were not able to locate Rahmet and Omar, Mr. Qadar is the only member serving time in prison. It is impossible not to recognize the unfairness of Mr. Qadar's incarceration while the more culpable parties remain free and at large." *Id.*

I noted that "[i]f I had discretion to impose a sentence I felt was appropriate, I would have sentenced Mr. Qadar to no less than 20 years and no more than 25 years. I feel that such a sentence reflects the seriousness of the offense but also accounts for Mr. Qadar's history, characteristics, and more limited role in the conspiracy . . . ." *Id.*

I understand that any further requests by Mr. Qadar for prisoner transfer are either pending or have been denied. Letter from Juwairiah Qadar; *Qadar v. Mayorkas*, No. 18-CV-6817 (KPF), 2021 WL 1143851, at *3 n.4 (S.D.N.Y. Mar. 24, 2021).[5]

Meanwhile, Mr. Qadar has not seen his family since at least 2008, when the United States

---

[4] I received a letter from Mr. Qadar's daughter, Juwairiah Qadar, in June 2021 stating that DOJ had denied Mr. Qadar's transfer request for a seventh time. Letter from Juwairiah Qadar, ECF No. 139.

[5] Mr. Qadar had sought federal court review of DOJ's transfer denials in the Southern District of New York, but the court dismissed the case on jurisdictional grounds. *Qadar*, 2021 WL 1143851, at *9–12.

changed the protocols of the Visa Waiver Program to require prior travel authorization for UK citizens. Def.'s Mot. 25. In 2013, Mr. Qadar's wife Fehmeeda and two of their children sought visas to visit Mr. Qadar in the United States, but they were denied on terrorism grounds. *Id.* at 25–27. They deny involvement with any terrorist organizations that would make them ineligible to travel to the United States. *Id.* at 28.

***First Motion for Sentence Reduction***

On May 12, 2020, during the height of the COVID-19 pandemic, Mr. Qadar submitted his first motion for a sentence reduction. *Id.* He proposed seventeen grounds for compassionate release. *Id.* 11–12. His primary bases for finding extraordinary and compelling reasons supporting his release were: (1) his good character; (2) the U.S. government's denial of family visitation; (3) his accomplishments while in custody, along with praise of him by prison staff and fellow inmates; and (4) his current conditions of incarceration due to the COVID-19 pandemic. *Id.*

As to his good character, Mr. Qadar submitted letters from his wife, all six of his children, and six of his nieces and nephews. *Id.* at 15–17, Ex. B. Many of them spoke of being inspired by Mr. Qadar's work as a mental health nurse for the National Health Service, a job in which he "loved taking care of people." *Id.* at 17. Indeed, all of his children had followed in his footsteps to become professionals. *Id.*, Ex. B. His children considered him a "role model" and his nieces and nephews a "father figure." *Id.* They have continued to keep in touch with him while incarcerated. *Id.* One son notes that his father has had a "huge impact on [his family's] lives," even from prison. *Id.* In further support, Mr. Qadar submitted letters from twenty-nine family members and friends prepared for his clemency petition. *Id.*, Ex. C.

As to the denial of family visitation, Mr. Qadar submitted the series of letters rejecting his transfer requests, *Id.*, Ex. G; affidavits from Mr. Qadar's wife and son regarding interactions with

U.S. visa officials, *id.*, Ex. J; and letters denying their applications for tourist visas, citing a statute restricting admission of individuals suspected of terrorist activities, *id.*, Ex. K. Mr. Qadar also provided a declaration from a psychologist, prepared in support of his transfer request, describing the toll prolonged family separation has taken on his mental health. *Id.*, Ex. L.

As to his accolades in prison, Mr. Qadar provided certificates from various courses he has completed, both while incarcerated in the UK and in the United States. *Id.*, Exs. M, N, P, Q, Y. Most notably, Mr. Qadar has served as a suicide watch companion, building on his previous work attending to people facing mental health challenges. *Id.*, Ex. P. He also has an exemplary disciplinary record after more than twenty years in prison. He only received one infraction in 2017 for receiving a commissary deposit from a fellow prisoner's mother that violated BOP policy. *Id.*, Ex. Y.

Additionally, Mr. Qadar submitted letters from seven members of the FCI Otisville staff, who all supported his commutation application. *Id.*, Ex R. They described Mr. Qadar as "intelligent," "always willing to help," "a very hard and dependable worker," and "a pleasure to work with." *Id.* Additionally, five fellow prisoners at Otisville wrote in support of Mr. Qadar. *Id.*, Ex S. They stated that "[w]henever he can, [Mr. Qadar] took the opportunity to make others smile." *Id.* He is "a man of . . . character and integrity" and "a compassionate man who loves and misses his family in the UK." *Id.* "He really enjoy[s] assisting others [] especially with their health[,] mentally and physically." *Id.* One man noted that "it is next to impossible to go an entire day around [Mr. Qadar] without him mentioning his family who lives in England . . . . [T]his good man goes through so much anguish just by having to hang up the phone at the end of a conversation with them." *Id.*

As to conditions during the pandemic, Mr. Qadar asserted that he had high blood pressure

and diabetes, which increased his risk of serious complications from contracting COVID-19. *Id.* 36–38. However, he lacked medical records confirming these diagnoses. He also asserted that the BOP's approach to containing COVID was unduly punitive, locking down incarcerated people for nearly twenty-four hours per day. *Id.* at 39.

Mr. Qadar also submitted evidence bearing on the 18 U.S.C. § 3553(a) sentencing factors. He noted that at the time of filing he had been in custody for nineteen years and three months, which amounted to a term of at least twenty-three years if good time credit is taken into account. *Id.* at 40. This sentence fell into the range I considered just punishment for his conviction. *Id.*, Ex. H.

Further, Mr. Qadar submitted an affidavit from Rubina, the wife of the victim, expressing that she has "no issues" with Mr. Qadar, she has "never thought him to be a threat," and she supports his clemency petition. *Id.*, Ex. W. She even offered to house him in New York City if he was released. *Id.*, Ex. X.

***May 20, 2020 Opinion & Order***

I denied Mr. Qadar's first motion for a sentence reduction on May 20, 2020. Op. & Order, ECF No. 122. I found that Mr. Qadar had failed to prove he suffered from underlying conditions that increased his risk of serious complications from COVID-19, and the general risk of contracting COVID in prison did not constitute an extraordinary and compelling reason. *Id.* at 4–5. Then I determined that evidence of Mr. Qadar's "rehabilitation, good behavior in prison, and good character alone cannot serve as an 'extraordinary and compelling' reason for his release" and his "accomplishments in prison are commendable" but "without more, they are not a basis on which to grant his motion." *Id.* at 6. Hewing closely to the U.S. Sentencing Commission's Policy Statement on what constitutes extraordinary and compelling reasons, I found that Mr. Qadar's

family circumstances "d[id] not justify his compassionate release at th[at] time." *Id.* at 7. I noted

that "I support [Mr.] Qadar's efforts to serve his sentence in the United Kingdom," but Mr. Qadar

had not shown that his spouse was incapacitated and he was the only available caregiver for her—

the only family circumstances the Sentencing Commission had recognized could amount to an

extraordinary and compelling reason. *Id.* at 8.

### *Factual Developments*

Meanwhile, much has changed since I issued my May 20, 2020 opinion and order. Mr.

Qadar has obtained his updated medical records, which show he was diagnosed with hypertension

by July 2020 and pre-diabetes by September 2020. Def.'s Mot. Recons., Exs. 11, 19. He had been

managing these conditions through diet and exercise but prolonged lockdown at Otisville has

prevented him from following his regimen, leading to increased blood pressure. Def.'s Mot.

Recons. 11–16. Indeed, "modified operations" remain in effect in BOP facilities, meaning that

"inmates are limited in their movements to prevent congregate gathering and maximize social

distancing." *BOP Modified Operations*, BOP, https://www.bop.gov/coronavirus/

covid19_status.jsp (last updated Nov. 25, 2020). Those in BOP custody may move around "in

small numbers" only for commissary, laundry, showers three times each week, telephone calls,

and mental health and medical care.[6] *Id.*

Additionally, Mr. Qadar's medical records reflect that he reported heart irregularities in

July 2020, including "chest pain" and feeling his "heart 'stopping while asleep.'" *Id.*, Exs. 13, 15.

An EKG revealed a "[p]robable septal infarct." *Id.* at 15. A septal infarct is "a patch of dead, dying,

or decaying tissue on the septum," which is "the wall of tissue that separates the right ventricle of

---

[6] Limited social visitations resumed at Otisville on June 13, 2021. *FCI Otisville Visitor Bulletin*, https://www.bop.gov/locations/institutions/otv/otv_tvp_eng_2106.pdf (last accessed July 22, 2021).

your heart from the left ventricle." *Septal Infarct*, healthline, https://www.healthline.com/ health/septal-infarct (last updated May 29, 2020). "A second test is typically taken to confirm the finding [of a septal infarct], because the results may instead be due to incorrect placement of electrodes on the chest during the exam." *Id*. Mr. Qadar has yet to receive this second test. Recons. Reply 2, ECF No. 142. Thankfully, however, Mr. Qadar now is fully vaccinated against COVID-19. Recons. Reply 4.

As of October 2020, Mr. Qadar's wife Fehmeeda had been diagnosed with osteoarthritis. Family Circumstances Letter 5, ECF No. 137. Due to this illness, "she is struggling with activities of daily living such as washing, dressing, cooking . . . [and] walking upstairs." *Id.*, Exs. at 5. According to their son, Jabeen, Fehmeeda also had been referred for hip surgery—"a risky option" but perhaps the "only" one, as "her condition is deteriorating rapidly." *Id.* at 9. Even though Mr. Qadar and Fehmeeda have six children, only the youngest, Juwairiah, still lives near Fehmeeda. *Id.* She has been trying to take care of her mother "but with work commitments and holding two jobs to provide for [Fehmeeda], it is hit and miss." *Id.* Having Mr. Qadar in the house "with his previous skills as a nurse" could help "cater to [Fehmeeda's] caring needs efficiently." *Id.*

### Legal Developments

In September 2020, the Second Circuit decided *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020), which instructed district courts on how to evaluate extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A)(i). The Second Circuit held that the Sentencing Commission's Policy Statement defining extraordinary and compelling reasons does not bind district courts when a defendant brings a motion for a sentence reduction directly. *Id.* at 237. As a result, district courts are free "to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release . . .

10

whether in isolation or combination." *Id.* at 237–38. "The only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'" *Id.* (quoting 28 U.S.C. § 994(t) (emphasis added)).

***Procedural History***

Based on factual and legal developments, Mr. Qadar filed a motion to reconsider my May 20, 2020 decision on October 16, 2020. Def.'s Mot. Recons. The government opposed on October 26, 2020, arguing in part that Mr. Qadar's diagnosis of a probable septal infarct needed to be confirmed with follow-up testing. Recons. Opp'n 7. The government submitted that Mr. Qadar had refused a follow-up appointment with a cardiologist the day before he filed his motion for reconsideration, insinuating that "some of his complaints were opportunistically raised." *Id.* at 8. I subsequently stayed briefing on Mr. Qadar's motion until he visited a cardiologist. Minute Entry (Oct. 27, 2020).

Mr. Qadar filed a letter in December 2020 informing the court that the cardiologist consultation still had not occurred. Letter, ECF No. 136. As of June 8, 2021, that remained the case, but Mr. Qadar sought leave to file his reply anyway, which I granted. Mr. Qadar filed that reply on June 18, 2021 and explained that he refused his original cardiologist appointment for fear of having to quarantine for twenty-four days to attend. Recons. Reply 2. He had requested a video consultation instead, but the BOP had failed to arrange one. *Id.* at 2–4. Mr. Qadar also raised an additional ground for compassionate release on reply—the declining health of Fehmeeda—so I permitted the government to file a sur-reply, which it did on June 24, 2021. Gov't's Sur-reply, ECF No. 143. Mr. Qadar sought a final letter response. Letter, ECF No. 144. I allowed it, Text Order (June 25, 2021), and he filed the document on June 29, 2021, Final Response, ECF No. 145.

## LEGAL STANDARD

"A motion for reconsideration may be granted where the moving party identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Mathis*, No. 02-CR-891 (ARR), 2020 WL 6784136, at *1 (E.D.N.Y. Nov. 18, 2020) (quoting *United States v. Nehmad*, No. 16-CR-829 (AKH), 2020 WL 6719380, at *1 (S.D.N.Y. Nov. 16, 2020)); *see also* Local Crim. R. 49.1(d).

The First Step Act allows criminal defendants to move for "[m]odification of an imposed term of imprisonment" before a federal sentencing court. 18 U.S.C. § 3582(c). To qualify for such relief, defendants must show: (1) that they have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on [their] behalf or the lapse of 30 days from the receipt of such a request by the warden of [their] facility, whichever is earlier"; (2) that "extraordinary and compelling reasons warrant" a reduction in the term of imprisonment; (3) that these reasons outweigh "the factors set forth in section 3553(a) to the extent that they are applicable"; and (4) that a sentence reduction "is consistent with applicable policy statements issued by the Sentencing Commission." *Id*. § 3582(c)(1)(A); *see United States v. Cato*, No. 16-CR-326 (ARR), 2020 WL 5709177, at *3 (E.D.N.Y. Sept. 24, 2020) (noting a defendant bears the burden of proof). "Even if a defendant carries this burden, district courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *Cato*, 2020 WL 5709177, at *3 (citation and quotation marks omitted).

Accordingly, in determining what constitutes "extraordinary and compelling reasons," a district court has discretion to consider "the full slate" of arguments that defendants present to support a sentence reduction, "whether in isolation or combination." *Brooker*, 976 F.3d at 237, 238. "The only statutory limit on what a court may consider to be extraordinary and compelling is

that '[r]ehabilitation . . . *alone* shall not be considered an extraordinary and compelling reason.'"

*Id*. at 237–38 (quoting 28 U.S.C. § 994(t) (emphasis added)).

The Sentencing Commission's policy statement explicating "extraordinary and compelling reasons" under § 3582(c)(1)(A)(i) does not bind a district court, but it does provide some guidance. *See id*. at 236. Where a defendant seeks a sentencing modification due to medical conditions, the Sentencing Commission suggests that "extraordinary and compelling reasons" may exist in two scenarios. First, "[a] defendant is suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S. Sentencing Comm'n, U.S. Sentencing Guidelines Manual § 1B1.13 cmt. 1(A)(i) (2018) ("U.S.S.G."). Second, "[a] defendant is . . . suffering from a serious physical or medical condition, . . . suffering from a serious functional or cognitive impairment, or . . . experiencing deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [the defendant] is not expected to recover." *Id.* cmt. 1(A)(ii).

Where a defendant seeks a sentencing modification due to family circumstances, the Sentencing Commission suggests that "[t]he death or incapacitation of the caregiver of the defendant's minor child" or "[t]he incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for" that person may constitute extraordinary and compelling reasons. *Id.* cmt. 1(C). In any scenario, "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* cmt. 2.

Even if extraordinary and compelling reasons exist, they must outweigh the 18 U.S.C. § 3553(a) factors to warrant sentence reduction. *See* 18 U.S.C. § 3582(c)(1)(A). These factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and sentencing range [provided for in the U.S.S.G.] . . . .

(5) any pertinent [Sentencing Commission] policy statement . . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.* § 3553(a).

Lastly, "the [c]ourt . . . looks to, but does not consider itself bound by, the Sentencing Commission's view that a sentence reduction would be consistent with its policy statements if '[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).'" *United States v. Hatcher*, No. 18-CR-454(10) (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting U.S.S.G. § 1B1.13(2)). The § 3142(g) factors largely duplicate those in § 3553(a), but they also include "whether the offense is a crime of violence" and "the weight of the evidence against the [defendant]." 18 U.S.C. § 3142(g)(1)–(4).

## DISCUSSION

Mr. Qadar raises two primary grounds for reconsideration of my May 20, 2020 opinion and order denying a sentence reduction: (1) *Brooker* constituted a change in controlling law such that I now have more flexibility to consider potential reasons for his release; and (2) new evidence is available concerning his medical conditions, the negative effects of continued COVID lockdown, and Fehmeeda's deteriorating health.[7] Def.'s Recons. Mot. 1.

---

[7] Mr. Qadar submitted his motion for reconsideration after the fourteen-day deadline set by the

The government argues that *Brooker* does not change the outcome here because I already assumed the Sentencing Commission's policy statement did not constrain me in my original decision. Recons. Opp'n 6. I disagree. In my opinion and order, I noted that "[s]ome district courts have concluded that the court may make an 'independent assessment' of whether 'extraordinary and compelling reasons' for release are present, looking to the Policy Statement only for 'guidance.'" Op. & Order 3 (citations omitted). But particularly in analyzing Mr. Qadar's family circumstances, I hewed very closely to the Policy Statement, denying release on this ground because Mr. Qadar failed to show "'[t]he death or incapacitation of the caregiver of [his] minor child/[ren]' nor '[t]he incapacitation of [his] spouse or registered partner when [he] would be the only available caregiver for [that person,]' the only family circumstances acknowledged by the applicable Sentencing Guidelines to permit compassionate release." *Id.* at 8. *Brooker* explicitly empowers me to look beyond the policy statement to evaluate potential extraordinary and compelling reasons justifying release—"whether in isolation or combination"—so long as I do not rely on rehabilitation alone. 976 F.3d at 237–38. Thus, I now may view the "full slate" of reasons Mr. Qadar proposed in his original motion in a different light. *Id.* at 237.

The government also argues that the new evidence Mr. Qadar has submitted fails to establish extraordinary and compelling reasons. Recons. Opp'n 8; Gov't's Sur-reply 3–4. I again disagree. I now find that the new evidence concerning Mr. Qadar's medical conditions, the effects of continued lockdown, and Fehmeeda's declining health, combined with preexisting evidence of his good character, rehabilitation, and prison accolades, constitutes extraordinary and compelling reasons supporting release. *See Nehmad*, 2020 WL 6719380, at *2 (reconsidering compassionate

---

local rules had passed. Crim. Local Crim. Rule 49.1(d). But "courts retain discretion to excuse an untimely filing," and I exercise my discretion to review the merits of Mr. Qadar's motion. *Nehmad*, 2020 WL 6719380, at *1.

release denial because of *Brooker* and new evidence). I also find that the § 3553(a) factors do not outweigh these reasons. I thus revisit the conclusions in my May 20, 2020 opinion and order.

## I. Mr. Qadar Has Shown Extraordinary and Compelling Reasons Justify His Release.

Mr. Qadar has shown that the combination of three categories of facts constitutes extraordinary and compelling reasons justifying his release: (1) his medical conditions and the effects of prolonged COVID lockdown; (2) his family circumstances; and (3) his good character, rehabilitation, and prison accolades.[8]

### A. Medical conditions and effects of prolonged COVID lockdown

Many courts have held that the COVID-19 pandemic combined with a defendant's high-risk conditions recognized by the Centers for Disease Control ("CDC") may constitute extraordinary and compelling reasons justifying release. *See Cato*, 2020 WL 5709177, at *4 (collecting cases). However, some courts have found that "[a]ccess to an approved COVID-19 vaccine generally counsels against compassionate release based on COVID risk, due to the strong evidence of the effectiveness of each of the vaccines." *United States v. Mena*, No. 16-CR-850 (ER), 2021 WL 2562442, at *3 (S.D.N.Y. June 23, 2021) (citing *United States v. Kosic*, 18-CR-30 (PAC), 2021 WL 1026498, at *2 (S.D.N.Y. Mar. 17, 2021)). *But see United States v. Sawyer*, No. 15-CR-160(1) (BO), 2021 WL 3051985, at *2 (E.D.N.C. June 15, 2021) (finding a defendant with multiple underlying conditions had demonstrated extraordinary and compelling reasons despite vaccination in part because of concerns that COVID-19 vaccines are less effective for obese people and those with other severe health conditions).

I previously found that Mr. Qadar failed to prove he had been diagnosed with an underlying

---

[8] Mr. Qadar met the exhaustion requirement before filing his original motion, Def.'s Reply, Ex. A, ECF No. 121; Gov't Opp'n 9 n.6, ECF No. 120, so I need not examine that issue here.

condition that heightened his risk of serious complications from contracting COVID-19. Op. & Order 4–5. Now Mr. Qadar has proven that he suffers from hypertension, a condition that "possibly . . . can make you more likely to get severely ill from COVID-19." *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 13, 2021) ("CDC Guidelines"); Def.'s Mot. Recons., Exs. 10–13. He also has shown a preliminary diagnosis of a septal infarct. Def.'s Mot. Recons., Exs. 15. Because a septal infarct is a heart condition, it "can make you more likely to get severely ill from COVID-19." CDC Guidelines. Although Mr. Qadar's diagnosis of a septal infarct remains unconfirmed, his reports of "chest pain" and feeling his "heart 'stopping while asleep'" are still concerning. Def.'s Mot. Recons., Exs. 13, 15. Mr. Qadar has, however, been fully vaccinated, Gov't's Sur-reply 3, which likely reduces his risk, *When You've Been Fully Vaccinated*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html (last updated July 16, 2021).

Regardless of defendants' vaccination status, "courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'" *Hatcher*, 2021 WL 1535310, at *3 (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); *see also United States v. Reiter*, No. 87-CR-132 (VSB), 2021 WL 1424332, at *8 (S.D.N.Y. Apr. 15, 2021) (finding the harshness of a vaccinated defendant's conditions of confinement "militate[d] in favor of finding 'extraordinary and compelling reasons'" despite decreased medical risk); *United States v. Mcrae*, No. 17-CR-643 (PAE), 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century

deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison.").

"While harsh conditions of confinement alone are insufficient," if those conditions deprive defendants of the services they need to treat "serious mental and physical health issues," such deprivations may support a finding of extraordinary and compelling reasons. *Hatcher*, 2021 WL 1535310, at \*4. Indeed, in *United States v. Pina*, the court found extraordinary and compelling reasons where prolonged lockdown "substantially curtailed" a defendant's ability to treat his Post-Traumatic Stress Disorder through exercise and "confinement to his cell for 22 hours a day" exacerbated his depression and anxiety. No. 18-CR-179 (JSR), 2020 WL 3545514, at \*2 (S.D.N.Y. June 29, 2020). And in *Hatcher*, the court found the same where prolonged lockdown precluded the defendant, who was struggling with mental health and substance abuse issues, from accessing "mental health care" and "drug abuse treatment." 2021 WL 1535310, at \*4.

Here, Otisville's lockdown—which has lasted in one form or another for sixteen months—has prevented Mr. Qadar from adequately managing his hypertension and pre-diabetes through diet and exercise. Def.'s Mot. Recons. 18. This has led to high blood pressure readings and complaints of chest pain and heart irregularities. *Id.*, Exs. 10–16, 22–25. While his vaccination against COVID-19 may lessen his risk of serious complications from contracting the virus, the prolonged lockdown's effect on Mr. Qadar's overall health strongly supports a finding of extraordinary and compelling reasons.

### B.  Family circumstances

The Sentencing Commission Policy Statement suggests that the "incapacitation of [a] spouse or registered partner when [a defendant] would be the only available caregiver for [that person]" could constitute an extraordinary and compelling reason in itself. U.S.S.G. § 1B1.13 cmt. 1(C)(ii). Many courts, however, have credited family circumstances that do not quite meet this

standard toward finding extraordinary and compelling reasons. For example, a court in the District of Connecticut found that even though a defendant "would not be the only available caregiver" for his mother, who was suffering from a terminal lung disease, he "could assist his mother in a way that no other person currently can . . . as a live-in caregiver." *United States v. Cruz*, No. 94-CR-112 (JCH), 2021 WL 1326851, at \*10–11 (D. Conn. Apr. 9, 2021). Similarly, a court in the Northern District of Illinois found that even though "there may be other family members who could care for" a defendant's wife, who was suffering from a serious liver disease that had impaired her immune system, the defendant "would reasonably be expected to be [his wife's] primary caregiver" as her spouse. *United States v. Hansen*, No. 17-CR-50062 (MFK), 2020 WL 2219068, at \*2 (N.D. Ill. May 7, 2020); *see also United States v. Ledezma-Rodriguez*, 472 F. Supp. 3d 498, 507 (S.D. Iowa 2020) (considering "the need to care for a parent" as "supportive of release" even where the defendant "did not produce enough evidence that he is the only available child who can aid[] his mother").

Mr. Qadar has shown that his wife, Fehmeeda, suffers from osteoarthritis and needs constant care to tackle everyday tasks. Family Circumstances Letter, Exs. at 5–9. His youngest daughter has shouldered the burden of caring for her mother, but balancing that with providing for her financially has become an enormous strain. *Id.* at 9. Mr. Qadar's son avers that Mr. Qadar would live with Fehmeeda if released and could apply his "previous skills as a nurse" to care for her in a way that none of his other family members could. *Id.* These family circumstances are just as poignant and compelling as those present in *Cruz* and *Hansen*.[9]

---

[9] The government argues that a spouse's incapacitation is inevitable for defendants serving life sentences and thus cannot be an "extraordinary and compelling reason" for release. Gov't's Sur-reply 3. But that argument contradicts the Sentencing Commission's recommendations in the Policy Statement, which do not exempt people serving life sentences from establishing extraordinary and compelling reasons based on their spouse's incapacitation.

Further compounding the difficulties of his family circumstances is Mr. Qadar's prolonged separation from his wife and children in the UK. Despite the UK's apparent willingness to accept Mr. Qadar and my full support behind his participation in the prisoner transfer program, *see* Def.'s Mot., Exs. F, H, DOJ has continued to deny Mr. Qadar's repeated requests for a treaty transfer, *Id.*, Ex. G; *cf. Nehmad*, 2020 WL 6719380, at *2 (finding extraordinary and compelling reasons where the government agreed to transfer a defendant to a Mexican prison but failed to do so within one year). Making matters worse, Mr. Qadar's wife and children have been unable to obtain tourist visas to visit Mr. Qadar in prison for the past thirteen years. Def.'s Mot. 25. While Mr. Qadar has consistently communicated with his family through virtual means, the lack of physical contact for over a decade has made his life sentence even more severe. *See id.*, Ex. L. Thus, Mr. Qadar's family circumstances strongly support finding extraordinary and compelling reasons.

### C. Rehabilitation, good character, and prison accolades

The Second Circuit has acknowledged that while rehabilitation "alone" does not constitute an "extraordinary and compelling reason," courts may consider it as a factor in determining if there are extraordinary and compelling reasons for compassionate release. *Brooker*, 976 F.3d at 238; *see also Reiter*, 2021 WL 1424332, at *9 (collecting cases); *United States v. Cabrera*, No. 01-CR-10469 (WGY), 2021 WL 3046824, at *1 (D. Mass. June 28, 2021) (considering rehabilitation in modifying life sentence to twenty-four-and-one-half years); *United States v. Fisher*, 493 F. Supp. 3d 231, 236 (S.D.N.Y. 2020) (same in modifying life sentence to time served). In my original order, I rejected Mr. Qadar's arguments that his "rehabilitation, good behavior in prison, and good character *alone*" constituted an extraordinary and compelling reason.[10] Op. & Order 6 (emphasis

---

[10] I distinguished Mr. Qadar's case from *United States v. Almontes*, 05-CR-58 (SRU), 2020 WL 1812713 (D. Conn. Apr. 9, 2020), and *United States v. Cantu-Rivera*, No. 89-CR-204 (SL), 2019 WL 2578272 (S.D. Tex. June 24, 2019), because the defendants there had raised additional successful

added). However, after *Brooker*, and in combination with new evidence, I find these factors support his release.

Mr. Qadar has shown he has a near-perfect disciplinary record in his more than twenty years in prison. Def.'s Mot., Ex. Y. He has obtained numerous certificates and served the inmate community through being a suicide watch companion and fitness instructor. *Id.*, Exs. M, N, P, Q, Y; *see also id.*, Ex. R ("Qadar is a good role model for those looking to improve their health and physical fitness."). He has maintained contact with his children abroad and has continued to have a "huge impact" on their lives. *Id.*, Ex. B. Taken together, these facts show significant rehabilitation. *See United States v. Panton*, No. 89-CR-346 (LAP), 2020 WL 4505915, at *7 (S.D.N.Y. Aug. 4, 2020) (crediting that a defendant had "maintained a good disciplinary record, [] taken advantage of numerous courses and other opportunities to enable a law-abiding life, [] evidenced a desire to help the outside community . . . [and] maintained an exceptional degree of contact with his children" in modifying life sentence to time served).

Further, seven staff members at Otisville support Mr. Qadar's release, describing him as a "dependable worker" who would be a "productive person" in society. Def.'s Mot., Ex. R; *see United States v. Mapp*, 467 F. Supp. 3d 63, 65 (E.D.N.Y. 2020) (crediting that "[c]orrectional staff . . . have commended [the defendant] as a 'model inmate'"). And his fellow prisoners revere him as a man of "character and integrity." Def.'s Mot., Ex. S; *see Rodriguez*, 492 F. Supp. 3d at 312 (considering letters from fellow inmates as evidence of rehabilitation). Even Rubina, the victim's

---

grounds for compassionate release. Op. & Order 6–7. Despite acknowledging that the case "presents similarities" to Mr. Qadar's, I also distinguished *United States v. Millan*, No. 91-CR-685 (LAP), 2020 WL 1674058 (S.D.N.Y. Apr. 6, 2020), because that defendant had not committed a violent crime. Op. & Order 7. These cases no longer counsel against finding that Mr. Qadar has shown extraordinary and compelling reasons because the new evidence he has raised tips the scales in his favor.

wife, has expressed her forgiveness of Mr. Qadar and offered to house him in New York if released. Def.'s Mot., Exs. W, X. These facts all support finding extraordinary and compelling reasons.

### D. Overall assessment

Based on the record, I hesitate to decide that any one of the grounds Mr. Qadar raises for his release constitutes an extraordinary and compelling reason "in isolation." *Brooker*, 976 F.3d at 237. But I need not do so. A confluence of factors may establish extraordinary and compelling reasons "in . . . combination." *Id.*; *see, e.g.*, *United States v. Cavely*, No. 00-CR-157 (TCK), 2021 WL 2843833, at *4–6 (N.D. Okla. July 7, 2021) (finding combination of medical conditions, rehabilitation, and lack of disciplinary infractions constituted extraordinary and compelling reasons for vaccinated defendant); *United States v. Weissinger*, No. 06-CR-132 (CDP), 2021 WL 2252824, at *4–5 (E.D. Mo. June 2, 2021) (same for combination of change in sentencing law, exemplary prison conduct, demonstrated rehabilitation, and medical conditions despite vaccination); *Cruz*, 2021 WL 1326851, at *4–11 (same for combination of young age at sentencing, extraordinary rehabilitation, medical conditions, and family circumstances); *United States v. Thrower*, 495 F. Supp. 3d 132, 143 (E.D.N.Y. 2020) (same for combination of rehabilitation, mental health issues, and medical conditions); *Rodriguez*, 492 F. Supp. 3d at 310–13 (same for combination of medical conditions, effects of COVID lockdown, and rehabilitation). I have no doubt that the totality of circumstances present in Mr. Qadar's case—his medical conditions (even in light of his vaccination status), the negative effects of prolonged lockdown, his family circumstances, his rehabilitation, his good character, and his prison accolades—constitutes extraordinary and compelling reasons justifying his release.

## II. Extraordinary and Compelling Reasons Outweigh the Section 3553(a) Factors.

"Because Mr. [Qadar]'s sentence was mandatory, this is [my] first opportunity to

functionally weigh the § 3553(a) factors in his case." *United States v. Perez*, No. 02-CR-7 (JBA), 2021 WL 837425, at *4 (D. Conn. Mar. 4, 2021). Turning first to the nature and circumstances of the offense, it is well established that Mr. Qadar committed a serious and heinous crime. "There is no crime more serious than murder." *Cruz*, 2021 WL 1326851, at *12. I also cannot ignore that Mr. Qadar received a mandatory life sentence for his murder-for-hire conviction. Sentencing Tr. 11:5–7; 18 U.S.C. § 1958. That being said, "the gravity of the offense does not categorically preclude [me] from reducing [Mr. Qadar's] sentence." *Perez*, 2021 WL 837425, at *5. Nor does "the mandatory component" of his sentence bar relief. *Id*.

Turning to his history and characteristics, Mr. Qadar had no notable criminal history before Shaukat's murder. PSR ¶¶ 51–54 (showing Mr. Qadar was convicted of driving without a license in 1984 and fighting in 1987). He lived a productive and law-abiding life in the UK, working as a nurse for mental health patients. *Id*. ¶¶ 73–74, 76–81. Further, "evidence of postsentencing rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011). As discussed above, Mr. Qadar has maintained a near-perfect disciplinary record in prison. Def.'s Mot., Ex. Y. He "dedicated himself to helping others" *Fisher*, 493 F. Supp. 3d at 238, through acting as a fitness instructor and suicide watch companion, Def.'s Mot, Exs. P, R. He maintained constant contact with his family and obtained numerous certificates "despite having . . . no realistic hope of release." *Fisher*, 493 F. Supp. 3d at 237 (citation omitted); *Cabrera*, 2021 WL 3046824, at *1 (observing that, for a defendant serving a life sentence, "[t]he sincerity of his [rehabilitation] efforts is made manifest by the fact that he had no reason to expect he would ever see the outside of the prison walls"); Def.'s Mot., Exs. M, N, P, Q, Y.

Turning to the need for the sentence imposed to reflect the seriousness of the offense and

provide just punishment, as I noted in my letter to DOJ, if I had had discretion to set Mr. Qadar's sentence, I would have sentenced him "to no less than 20 years and no more than 25 years." Def.'s Mot., Ex. H. As of writing, Mr. Qadar has served more than twenty-and-a-half years in prison, which amounts to more than a twenty-four-year sentence if good time credits are taken into account. PSR 1 (noting Mr. Qadar has been in custody since his January 22, 2001 arrest). Given that, I feel that a sentence of time served "reflects the seriousness of the offense but also accounts for Mr. Qadar's history, characteristics, and more limited role in the conspiracy." Def.'s Mot., Ex. H; *see United States v. Barron*, No. 94-CR-559 (GW), 2020 WL 4196194, at *5 (C.D. Cal. July 9, 2020) (finding just punishment where the defendant had served the twenty-year sentence the sentencing judge had considered appropriate but could not issue because the court was bound to impose a mandatory life sentence). Such a sentence also affords adequate deterrence to similar conduct. A mandatory life sentence for murder-for-hire remains the default, and I depart from that here only because of Mr. Qadar's unique circumstances.

Turning to protecting the public, the government does not argue that Mr. Qadar poses a danger or risk of recidivism. Nor could it. Mr. Qadar is over sixty years old. PSR 2. His age combined with his extensive rehabilitation "mak[es] the likelihood of re-offending . . . remote." *Rodriguez*, 492 F. Supp. 3d at 315; *see also United States v. Rios*, No. 94-CR-112 (JBA), 2020 WL 7246440, at *4 (D. Conn. Dec. 8, 2020). Further, Immigration and Customs Enforcement has placed a detainer on Mr. Qadar because he is subject to mandatory removal from the United States. Def.'s Mot. 47, Ex. Y. If released, Mr. Qadar will be transferred to immigration detention and deported. *Id.* This lessens any potential danger he may pose. *United States v. Barriga-Beltran*, No. 19-CR-0116 (JS), 2021 WL 1299437, at *3 (E.D.N.Y. Apr. 7, 2021) (finding a defendant posed no danger because of immigration detainer); *Rios*, 2020 WL 7246440, at *5 (collecting cases

where district courts modified life sentences for defendants who were set to be deported if released).

Turning to the need for educational or vocational training, medical care, or other correctional treatment, Mr. Qadar has struggled to receive a follow-up cardiologist consultation for several months. Recons. Reply 1. While he bears some responsibility for refusing to attend the originally scheduled appointment, the fear of having to quarantine for twenty-four days to facilitate the visit contributed to his reticence. *Id.* at 2. Given these constraints, Mr. Qadar may have better access to a cardiologist if released.

Turning to the need to avoid unwarranted sentence disparities, I acknowledge that others convicted of murder-for-hire are serving mandatory life sentences. 18 U.S.C. § 1958. But that fact alone "does not create impermissible sentencing disparities." *Perez*, 2021 WL 837425, at *6. Notably, a sentence of time served here, which is the equivalent of a twenty-four-year sentence when good time credits are taken into account, exceeds both the average federal murder sentence in fiscal year 2020, which "was approximately 21 years," and the median sentence, which "was approximately 19 years." *Cruz*, 2021 WL 1326851, at *13. Further, Mr. Qadar's co-defendants are fugitives. As I noted in my letter to DOJ, "[i]t is impossible not to recognize the unfairness of Mr. Qadar's incarceration while the more culpable parties remain free and at large." Def.'s Mot., Ex. H.

Finally, I understand that this case does not involve financial restitution, but it is relevant to note that Rubina, the person most closely affected by the murder at the heart of this case, feels justice has been served. She supports Mr. Qadar's release and has offered to open her own home to him, despite his responsibility for her husband's death. *Id.*, Exs. W, X. Rubina's endorsement weighs significantly in favor of reducing Mr. Qadar's sentence.

Overall, the sentencing factors supporting Mr. Qadar's release outnumber those opposing it. *See Perez*, 2021 WL 837425, at *5 (finding § 3553(a) factors supported reducing mandatory life sentence for murder-for-hire to time served). While I acknowledge that he was convicted of an extremely serious offense that triggered a mandatory life sentence, he was the least culpable member of the conspiracy and has become fully rehabilitated. Thus, the § 3553(a) factors do not outweigh the extraordinary and compelling reasons for Mr. Qadar's release and in fact bolster them.[11]

## CONCLUSION

For the foregoing reasons, I grant Mr. Qadar's motion to reconsider my May 20, 2020 order denying compassionate release, and I reduce Mr. Qadar's life sentence to a sentence of time served. However, I stay this order for up to fourteen days to allow the BOP to arrange Mr. Qadar's release. *See Barriga-Beltran*, 2021 WL 1299437, at *4. If more than fourteen days are needed to make appropriate arrangements and ensure Mr. Qadar's safe transfer, the parties shall immediately notify the court and show cause why the stay should be extended. An amended judgment will follow. SO ORDERED.

                                                   _____/s/_____
                                                   Allyne R. Ross
                                                   United States District Judge

Dated:        July 22, 2021
                 Brooklyn, New York

---

[11] As noted above, the government does not argue Mr. Qadar poses a danger, and therefore his release is consistent with Sentencing Commission policy statements, as well.